[No. 1543.]

## EMELINE WILLIAMS *v.* THE STATE.

MURDER—EVIDENCE—CORROBORATION OF AN ACCOMPLICE WITNESS.—
See the opinion *in extenso*, and the statement of the case, for evidence
*held* insufficient to corroborate the testimony of an accomplice, upon
which alone a conviction of murder in the first degree was had.

APPEAL from the District Court of Washington. Tried below
before the Hon. I. B. McFarland.

The indictment charged the appellant with the murder of Bob
Williams, shown by the evidence to have been her husband, in
Washington county, Texas, on January 18, 1883. The jury,
upon her trial, found her guilty of murder in the first degree,
and assessed her punishment at confinement in the penitentiary
for the term of her natural life. The parties were negroes.

The important part of the testimony of Doctor Johnson, the
first witness for the State, as bearing at all upon the corrobora-
tion of the accomplice, is contained in the opinion. With re-
gard to other occurrences at the house of the deceased, after his
arrival, the doctor testified, in substance, that he saw some gun
wadding on the bed and floor, and some of the shot that passed
through the wall. He also saw the wadding and shot drawn
from the loaded barrel of the double barreled shot gun. The
other barrel had the appearance of having been recently dis-
charged. The wadding and shot drawn from the loaded barrel
were similar to that found on the bed and floor, and the shot
which had entered the wall, except that these latter were flat-
tened. When the witness arrived at the house, the defendant
was in earnest conversation with parties present. She came
out of the house as the witness approached, and said that her
husband was dead; that she was in bed with him when he was
killed, but did not hear the report of the gun, or know anything
about it until near day, when she awakened and started to hug
and kiss him. Thereupon she found him cold and dead. She
said that she sat up late that night, sewing; that Judge Wil-
liams went hunting, but returned before either she or the de-
ceased retired; that when Judge came in with his gun she told
him to place it behind the door, fearing, if he placed it else-

26

where, it might be knocked down; that Judge went to bed first, the deceased next, and she, the defendant, later, and after the deceased had fallen asleep. She saw that all the doors were fastened, and found them fast next morning. No one else was at the house that night.

Cross-examined, the witness stated that when he arrived at the house the defendant was conversing earnestly with other parties about the killing. She said that it was Judge's gun that had been found, and she accused him of killing his father. The witness saw nothing of Judge on that morning. The bedstead described was an ordinary cottage bedstead, and had an ordinary mattress upon it. The shot struck the wall a little above a line where the head of the deceased lay, and the party who fired the fatal shot must have been near the door and on his knees, or in a stooping position.

On re-direct examination, the witness stated that the head of the bedstead was against or near the wall, and that the shot could not have ranged much up or down after passing through the head, before striking the wall at a slight elevation. The defendant in her talk seemed to be talking and interested about the property. She displayed no manner of grief whatever.

The testimony of Judge Williams, the confessed accomplice, is set out in full in the opinion of this court.

B. S. Rogers testified, for the State, that he was the justice of the peace of the precinct in which the killing occurred. He went to the house of the deceased on the morning after the killing occurred, to hold an inquest over the body. The defendant told the witness that her old man was dead; that she was glad witness had come, and that she wanted witness to see that she got her rights. She said, further, that no one but herself and Judge were at the house during the night of the killing. The defendant testified, before the jury of inquest, that, as she found the door fastened just as it was fastened when she retired, there could have been no one in the house during the night but her-self, the deceased, and Judge. She stated, on her examination before the inquest, that Judge and the deceased went to bed about ten o'clock. That Judge loaded his gun early that night, and left, saying that he was going hunting, but returned before either she or the deceased retired; that Judge told her he sent Frank Taylor to procure ammunition for him. When the witness found her husband dead, she aroused Judge and told him. When Judge saw the body he exclaimed, "Lord." According to

her testimony on that trial, she and Judge built a fire, and went to the house of Cudjo Kinlow, and gave information of the death of the deceased. Judge's gun was found in a corner of the fence by some one, with the track of a bare-footed man leading from the house to the corner in which the gun was found, and which track she said looked like Judge's. She declared at the inquest that she heard no report of a gun during the night; the discharge did not arouse her. She waked up before day and discovered her husband's death when she kissed him. She had no idea at that time that he had been killed. She called to Judge to light the lamp.

Continuing his own testimony, the witness, Rogers, stated that he was unable to say whether or not the deceased and the defendant lived agreeably together. Each had frequently complained to him of the other. But one track, that of a bare-footed man, led from the house to the corner where the gun was found. The bedstead was about two feet high. The pillow perforated by shot was made of chicken feathers.

Cross-examined, the witness stated that he had known the defendant several years, during which time she has had many, but irregular "crazy spells." Witness had known her to do a great many foolish things. She sometimes carried her "things" into the street; would shout, sing, quarrel, curse, swear, jump up and down, and at times tore her clothing from her person. She frequently so conducted herself in church, and would keep up this conduct until arrested and confined in the calaboose. These spells were frequent, but witness could not say how often they recurred. When not under the influence of these spells, the defendant appeared to be a person of ordinary sense. She appeared perfectly sane on the morning of the inquest; talked much about property, and displayed no evidence of grief.

Cudjo Kinlow was the next witness for the State. He testified that the defendant and Judge Williams came to his house about one hour before day on the morning after the killing, and the defendant requested him to return with her and help lay out her husband, who, she said, was dead. Witness and his family went to the defendant's house with her. She displayed little or no grief, and did not cry that the witness saw. After daylight other neighbors came in, and the body was moved from the bed to the floor, when, for the first time, the wounds in the head were discovered. The defendant talked a great deal. The witness questioned her closely about the manner in which the door

was fastened, and about the gun that was found. She stated that the door was latched on the inside; that the gun found was Judge's gun; that she had not handled the gun; that she was not awakened during the night, and knew nothing of her husband's death until she waked up before day, and embraced and kissed him. Witness saw Judge two or three times that morning. He went off and came back each time he was seen. The last time he came back and went out, the defendant followed him around the house to the corner of the chimney, where she whispered something to him which the witness could not hear. Judge then left, and did not return until he was arrested and brought back. The defendant and the deceased did not get along well as man and wife. The defendant said nothing about Judge, or how the deceased came to his death, until the body was placed upon the floor and the gun was found. She said she did not know what she would do, and was afraid she would have to sell a mule and a bale of cotton. Witness heard the report of a gun in the direction of the house of the deceased, about midnight, on the night of the killing.

Cross-examined, the witness stated that the gun was found about fifteen or twenty steps from the house. Two tracks, leading to and from the house and the point where the gun was discovered, were found.

Frank Taylor testified, for the State, that he purchased a dime's worth of shot for Judge Williams, and gave them to him on the evening preceding the killing. Witness went hunting that night with Judge and other boys. Judge carried his gun. While in the woods witness discharged Judge's gun, and Judge reloaded both barrels with bullets. The hunting party spent but a short time in the woods. Judge did not say why he loaded his gun with bullets.

Tobe McClellan testified, for the State, that when it was discovered that the deceased had been shot, he looked for a gun, and found one in a corner of the fence, about twenty steps from the house, and a bare-footed track leading thence to the house. The defendant said that the gun belonged to Judge, but that she did not know who killed the deceased. Defendant followed Judge around to a corner of the house and whispered something to him which witness did not hear. Judge then disappeared and did not return. The State closed on this proof.

John Cain was the first witness for the defense. He testified that he had known the defendant since 1873; she has had irregu-

lar crazy fits ever since the witness had known her, recurring sometimes monthly, and even oftener. These fits would last usually from one to three days. While under the influence of these spells she would appear to be crazy; would shout, sing, swear, and do such things as a crazy person would ordinarily do. Witness had seen her so deporting herself on the street, with her clothes nearly torn from her person. Witness had known her attacked by these spells, which generally came on suddenly, during church, and her conduct on such occasions would compel the suspension of services. On these occasions she became furious and outrageous, and it would require the combined strength of two or three men to do anything with her. To the knowledge of the witness, the defendant had one of these spells two or three weeks before the deceased was killed. Witness did not know the condition of her mind at the time of her husband's death. Between these spells she was sane. She was generally known as "Crazy Emeline," and was so called. So far as the witness knew, she and the deceased lived agreeably together, except during her attacks of insanity, when she would leave home.

The testimony of Jack Lands, the jail guard, is substantially set forth in the opinion.

J. M. Hannah, the next witness for the defense, testified that he had Judge Williams in his charge at Chappell Hill, upon the accusation of murdering the deceased. Judge Williams told him, in substance, that he and the defendant concocted the plan to kill the deceased some ten days before it was carri'd into effect; that at the time they formulated the plan the deceased was away from home; that defendant told him that if they put the deceased out of the way, they could sell what he had, and live on it without working so hard; that after he fired the fatal shot, both he and defendant ran out and around the house, he one way, and the defendant the other; that he ran out barefooted, and put the gun out by the crib; that after he had disposed of the gun, he and the defendant went back to the door, and defendant called the deceased once, and he called deceased three times, without getting an answer, whereupon they went to bed, Judge in his own bed, and defendant in bed with the body of the deceased. Witness had known the defendant five or six years. At times she becomes perfectly crazy and frantic, and has to be confined.

Cross-examined, witness stated that he had related only the substance of what Judge told him. He could not recall his exact

language. Defendant displayed no grief on the morning after the killing. She seemed anxious only about the property.

Doctor Lockett testified, for the defense, that he had witnessed the death of many husbands and wives in all stations of life, and had known many instances where no outward manifestation of grief or sorrow by the survivor was apparent to the common observer. Defense closed.

In rebuttal, the State called W. H. Vinson, who testified that he had known the defendant about four months, from which time to the present she had been in his employ. During that time she had not been crazy. Her mind has been clear enough to work—cook, wash, iron, etc. He noticed something peculiar about her conduct and appearance two or three times. The defendant is a woman of scarcely average intelligence of her race. She was prompt in the discharge of her duties.

Doctor Johnson, recalled by the State, testified that the defendant appeared perfectly rational on the morning after the killing, and in his opinion was sane.

The motion for new trial presents the question involved in the opinion.

*W. H. Vinson* filed an able and elaborate brief for the appellant.

*J. H. Burts*, Assistant Attorney General, for the State.

HURT, JUDGE. Emeline Williams, the appellant, was convicted of the murder of her husband. The jury found her guilty of murder in the first degree, and assessed her punishment at confinement in the penitentiary for life.

There is but one question in the record, which is: Was Judge Williams, who shot and killed his father, Bob Williams, and who was made a witness by the State, sufficiently corroborated by the other witnesses or either of them, to warrant and sustain this conviction?

Judge Williams testified as follows: "That Emeline Williams is my step-mother, and Bob Williams, the deceased, was my father. Before the killing I had been hauling wood to town, and the day before the killing the defendant gave me a dime and asked me to get some shot. I did not get them, and gave the dime to Frank Taylor, and he bought the shot and gave them to me. I carried them home and put them on the shelf,

and went hunting that night with Frank Taylor, King Howard and Frank Kinlow; did not stay long; got home about eight o'clock and went to bed. Emeline, the defendant, waked me up and gave me the gun, and told me I must shoot my father, and I did it. She said that Bob was working her so hard, and she was going to have him killed and get her share of the property; and that there was the gun and witness should shoot him."

Cross by defense:

"Emeline made me light the lamp that night; she made me light the lamp every night; said the devils were after her; but said nothing about devils on night of killing. When I shot my father I was standing near the door; was not on my knees or stooping when I fired the shot. I first loaded my gun with squirrel shot, before starting hunting, and while in the woods shot off my gun at nothing, and loaded it with bullets, in presence of Frank Taylor, King Howard and Frank Kinlow. Defendant told me to go after the shot before supper; I went, got them from Frank, and carried them with me hunting. She told me when she waked me up to put twelve bullets in the gun, and I put them in. She told me when she gave me the gun if I did not kill my father she would kill me, and I was afraid she would. There was another gun in the rack over the door. Don't know that it was my duty to kill Emeline instead of my father. After I shot I gave defendant the gun, and we both went out together, and she put the gun in the corner of the fence. We went out and came back together, and defendant went to bed on the bed with my dead father, and I on my bed. We had no talk after that until, a little before day, she called me and said I must go to the quarter and make it known that my father was dead. That there was no agreement between witness and defendant before that night to kill the deceased, and did not state to J. M. Hannah in Chappel Hill, while in his custody as constable, that me and Emeline Williams had made up the plan about ten days prior to the time of the killing, to kill him, and that defendant then said if they put Bob out of the way they could sell what he had, and live on it, and they would, and they wouldn't have to work so hard. Did not tell said Hannah that after shooting both went out the door, Emeline went round the house one way and witness the other, and witness put the gun out by the corn crib, and went out bare-footed; and did not say we returned to the door, Emeline called Bob once, and he, witness, called him three times. Defendant put gun in corner of fence near crib."

The age, size and physical strength of this witness is not shown in the evidence. That he swore falsely in regard to the gun and the agreement between him and defendant to kill the deceased is quite probable, and may be conceded. But was he corroborated? It is insisted by the State that the following facts tend to connect defendant with the commission of this murder:

1. The accomplice, Judge Williams, swore that defendant, when she told him to shoot deceased, said that she was going to have him killed and get her part of the property, and that several witnesses testified that early next morning, without any signs of grief, she was talking of her part of the property.

2. That next morning, after the murder, the defendant "followed the witness, Judge Williams, around the house to the chimney, and whispered something in a low tone, and that Judge Williams immediately left, and did not return until she was arrested," thus showing a disposition to shield the murderer of her husband.

3. That defendant stated that, at the time her husband was shot, she was in bed with him, asleep, and was not aroused by the shot.

4. Defendant stated that she was in bed with her husband when he was shot, when the wound on deceased and the marks of the shot show this to be impossible, and that, therefore she was not asleep, but was up, and knew all about the homicide.

The above are the facts urged by the State as tending to connect defendant with this murder. Let us consider them in the order stated.

1. If the defendant talked of her property the morning after the homicide, this was very imprudent, and not such conduct as a refined and intelligent wife would be guilty of; but still she may have done this, and yet not be guilty of the murder of her husband. While several witnesses speak to the fact that she did "talk of her part of the property," none of them pretend to state what she said, nor the exact state of facts under which the property question came up.

That the defendant showed no signs of grief may also be true, and this be no evidence of guilt. Some persons do not exhibit their feelings at all. Some are very boisterous, while others are calm and stoical, and yet their grief may be of the most intense character.

2. "The defendant said something to the accomplice, Judge

Williams, and he left and did not return until arrested and he was brought back." What was said to Judge Williams? We are left to inference, when the State could have proved by him, who was certainly a very willing witness, just what she did say. The defendant whispered to him, therefore she advised him to leave! This may be the correct conclusion, and it may not. She may have said something to him which did not prompt, induce or suggest the propriety of his flight.

3. "That she stated that she was in bed with her husband when he was shot, but was not aroused from her sleep by the shot." This may or may not be true; all persons are not alike with respect to this matter. Some are easily awakened, while it requires very great exertions to arouse others. That her statement may be true is strongly supported by the evidence of several witnesses who testified that at times the defendant was crazy; that she would scatter her property in the streets; that she had been sent to prison as a lunatic, and kept there for several weeks. Lands, the jail guard, states that "she was an unusually sound sleeper. I have been in the jail at night and slammed the jail door, which is of iron, and very heavy, in fastening it, and passed through the room in which she was sleeping, without awakening her. She would snore all the time vigorously, as was her habit, and show no signs of knowing that any one was there." *    *

4. "Defendant stated that she was in bed when he was shot, when the wounds on the deceased and the marks of the shots on the bedding showed this to be impossible."

While the facts contained in the three propositions already noticed may be consistent with the innocence of the defendant, or may not be sufficient corroboration of the accomplice, the facts stated in this fourth and last proposition are of a very serious character.

Does the evidence sustain the fourth proposition? Is it a fact that the wounds on the deceased, and the marks of the shot on the bedding, bedstead and wall, demonstrated the impossibility of defendant's being in the bed when her husband was shot?

After a most thorough examination of the record, we are constrained to say they do not. Upon this subject, Doctor Johnson says: "The house in which I found the deceased is a box house, about sixteen or eighteen feet square. There was a door south and a chimney west. There were two beds in the room. The one in the southeast corner of the room had a mattress and two

pillows on it.   The pillow on the front of the bed was filled with feathers, and had been shot; also one or two rounds of the head of the bed had been shot, and some shot went into and through the wall of the house.   The pillow on the back of the bed was filled with cotton.   Bob Williams was lying in the floor, dead, with a hole in the left and back part of the head, a gun shot wound entering the left side of the head, in the rear of the left ear, producing death instantly."

Judge Williams, the accomplice, states in substance that he was standing near the door when he shot his father.

The evidence relating to the physical facts of the homicide is very uncertain and exceedingly unsatisfactory.   Taking into consideration the enormity of this offense and the fearful consequences of an unjust conviction, it is passing strange indeed that these facts should be left in such great uncertainty; especially so when they are susceptible of being portrayed in the clearest and most satisfactory manner.   The bed was in the northeast corner of the house.   In which direction was the head of the bed?   North, east, or west?   Was deceased on the front or the back part of the bed?   Were there marks of shot in the cotton pillow?   Was the door situated in the middle of the south end of the house, or near the east or west corner of the south end?   The shot entered the left side of the head.   Did they enter directly or obliquely?   If the deceased was killed instantly, who took the corpse from the bed and placed it on the floor?   Were the rounds of the bedstead, which were struck by the shot, opposite the front or rear pillow?   Did the shot strike the north or east wall of the house?   These are all questions of more or less importance, and with the slightest care or pains a clear answer could have been obtained to each and all of them.   In a case of such importance as this, with such consequences, we do not feel that we would be performing our duty to sanction a verdict upon such a record.

But let us return to the proposition, which is that the evidence does not sustain or warrant the fourth proposition.

If deceased had been lying behind, with his head to the east, the statement of the defendant is highly improbable.   If lying in front, improbable but not impossible.   If the deceased was lying in front with his head to the north (with the gun at the door in the hands of the accomplice), it was not improbable for him to have been shot on the left side of the head if lying on his right side.   Hence the importance of the fact whether the shot

entered directly or obliquely. But if deceased was lying in front, with his head to the west, if on his back, the shot would have entered the right side of his head, unless he had been lying well on his right side. Hence, again, the importance of knowing whether the shots which struck the rounds of the bed were fired from a point on a line with the bed as it stood sideways, or from a point on a line with the bed as it stood lengthways. And here again we are left completely in the dark.

This fourth and strongest position of the State not being supported or presented by the facts, we are compelled to hold that, under the circumstances of this case, the accomplice is not sufficiently corroborated for this judgment to be sustained.

Again, if we were inclined to sustain this conviction, we would hesitate strenuously to do so, when the record clearly shows that important facts, easy of proof, were omitted, thus exhibiting a degree of carelessness in a case of such vital importance which cannot be tolerated by this court.

Because, upon another trial, that which is left in doubt and uncertainty can be made clear and certain, and because, as the record presents the facts to us, the accomplice is not sufficiently corroborated, the judgment is reversed and the cause remanded.

*Reversed and remanded.*

Opinion delivered February 6, 1884.